Slip Op. 20-59

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **IN ZONE BRANDS, INC. and GOOD2GROW, INC.,**<br><br>    Plaintiffs,<br><br>    v.<br><br>**UNITED STATES,**<br><br>    Defendant. | **Before: Jane A. Restani, Judge**<br><br>**Court No. 17-00025**<br><br>**PUBLIC VERSION** |

## OPINION

[In Customs classification matter, Defendant's motion for summary judgment is granted and Plaintiffs' cross-motion for summary judgment is denied.]

Dated: May 5, 2020

  Daniel G. Jarcho, Kyle G. A. Wallace, Jason M. White, Brian W. Lutz, and Chulian Yang Allston & Bird LLP, of Washington, D.C. for the Plaintiffs, In Zone Brands, Inc. and Good2Grow, Inc.

  Peter A. Mancuso, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington, D.C., for the Defendant, the United States of America. With him on the brief were Joseph H. Hunt, Assistant Attorney General, U.S. Department of Justice and Justin R. Miller, Attorney-in-Charge, International Trade Field Office, Civil Division, U.S. Department of Justice, Commercial Litigation Branch. Of Counsel on the brief was Michael W. Heydrich Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, N.Y.

  **Restani, Judge:** Plaintiffs In Zone Brands, Inc. ("In Zone") and Good2Grow, Inc. ("Good2Grow") brought this action contesting U.S. Customs and Border Protection's ("Customs") tariff classification of the subject merchandise. The merchandise at issue ("bottle toppers") depict the heads and/or busts of popular children's characters such as Iron Man, Thor, Sponge Bob, Angry Birds, Care Bears, Ariel, and Paw Patrol, fastened to a screw-top straw and base made for use with Plaintiffs' children's beverages. In cross-motions for summary judgment,

Plaintiffs argue that the bottle toppers are properly classified as toys under Heading 9503 of the Harmonized Tariff Schedule of the United States ("HTSUS") and the government argues that Customs properly classified the bottle toppers under as "stoppers, lids, caps and other closures" under Heading 3923.50. For the reasons stated below, the government's motion is granted and Plaintiffs' motion is denied.

## I.   BACKGROUND

The bottle toppers were imported between January 9, 2013, and August 16, 2014. Def.'s Statement of Undisputed Material Facts ¶ 3 ("Def. Facts"); Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 3 ("Pl. Resp. Facts"). At liquidation, Customs classified the merchandise under subheading 3923.50.00, HTSUS (2013),[1] which provides for "Articles for the conveyance or packing of goods, of plastics; stoppers, lids, caps and other closures, of plastics: Stoppers, lids, caps and other closures."  Pl.'s Statement of Material Facts Not in Dispute ¶ 85 ("Pl. Facts"); Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 85 ("Def. Resp. Facts"). Good2Grow[2] timely protested, averring that the bottle toppers were properly classified under 9503.00.00, HTSUS as "Tricycles, scooters, pedal cars and similar wheeled toys; dolls' carriages; dolls; other toys; reduced-scale ('scale') models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof." Pl. Facts ¶¶ 86–87; Def. Resp. Facts ¶¶ 86–87. Although a protest at the Port of Atlanta was approved, Customs then issued HQ H264771, which led to the denial of protests at the Ports of Tampa and Jacksonville.

---

[1] The Court notes that some of the merchandise at issue is subject to the 2014 version of the HTSUS, but that there are no differences relevant to this case between the two versions. Accordingly, all citations will be to the 2013 version unless otherwise noted.

[2] Prior to 2015, Good2Grow, Inc. was called "In Zone Brands". See First Am. Compl. ¶ 5. For ease of reference, the court will refer to the company as Good2Grow.

Pl. Facts ¶¶ 88–91; Def. Resp. Facts ¶¶ 88–91. Good2Grow appealed these denials. The parties filed cross-motions for summary judgment and supporting briefs arguing their respective positions. See Def.'s Mot. for Summ. J. & Mem. in Supp. of Mot. for Summ. J., ECF No. 51 (June 28, 2019) ("Def. Br."); Pl.'s Cross-Mot. for Summ. J. & Mem. of Law in Resp. to Def.'s Mot. for Summ. J. & in Supp. of Pl.'s Cross-Mot. for Summ. J., ECF No. 70 (Nov. 8, 2019) ("Pl. Br.").

The following facts are undisputed. The bottle toppers are three-dimensional molded plastic figures made to resemble various licensed characters[3] that can be affixed to a spout with a valve and threaded base made to screw onto Good2Grow juice bottles.[4] Pl. Facts ¶ 5; Def. Resp. Facts ¶ 5. The spout, valve, and threaded base (the "forecap"), Def. Facts ¶ 14; Pl. Resp. Facts ¶ 14, complies with applicable U.S. Food and Drug Administration ("FDA") standards for beverage use. Def. Facts ¶ 22; Pl. Resp. Facts ¶ 22. Additionally, the bottle toppers also comply with toy-specific standard ASTM F963-11 for choke testing. Pl. Facts ¶ 53; Def. Resp. Facts ¶ 53. The bottle toppers are reusable, dishwasher safe, and spill-proof due to a one-way valve. Def. Facts ¶¶ 11, 13; Pl. Resp. Facts ¶¶ 11, 13. Good2Grow juice bottles are hermetically sealed with foil, which is removed prior to consumption. Pl. Facts. ¶ 17; Def. Resp. Facts ¶ 17. Good2Grow primarily targets children ages ten and younger, who comprise the majority of consumers. Pl. Facts ¶¶ 8–9; Def. Resp. Facts ¶¶ 8–9. The bottle toppers are, at times, sold without the juice bottle online, but most often are sold in retail locations (such as grocers, convenience stores,

---

[3] [[                                                                                               ]] Def. Facts ¶ 28; Pl. Resp. Facts ¶ 28.

[4] The toppers are uniquely threaded such that they do not fit standard bottles. Pl. Facts. ¶ 12; Def. Resp. Facts ¶ 12; Def. Facts ¶ 7; Pl. Resp. Facts ¶ 7.

mass merchants, and drug stores) with the juice bottle included. Def. Facts ¶¶ 30, 43; Pl. Resp. Facts ¶¶ 30, 43; Pl. Facts ¶ 24; Def. Resp. Facts ¶ 24.

## II.  JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(a) (2012).[5] The court will grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a). Summary judgment is appropriate in tariff classification cases where "there is no genuine dispute as to the nature of the merchandise and the classification turns on the proper meaning and scope of the relevant tariff provisions." Deckers Outdoor Corp. v. United States, 714 F.3d 1363, 1371 (Fed. Cir. 2013). The Court decides classification de novo. See 28 U.S.C. § 2640 (a)(1); Telebrands Corp. v. United States, 865 F. Supp. 2d 1277, 1279–80 (CIT 2012).

## III.  DISCUSSION

### a. Legal Framework

The plaintiff has the burden of demonstrating that the government's classification is incorrect, but the court has an independent duty to determine the correct classification. See Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984). The meaning of a tariff term is a question of law and whether subject merchandise falls under a given tariff term is a question of fact. See Wilton Indus. v. United States, 741 F.3d 1263, 1265–6 (Fed. Cir. 2013) (citations omitted). The General Rules of Interpretation ("GRIs") and, if applicable, the Additional U.S. Rules of Interpretation ("ARIs"), guide classification decisions under the HTSUS. Id. at 1266. The court applies the GRIs in numerical order and only continues to a subsequent GRI if "proper classification of the imported goods cannot be accomplished by reference to a preceding GRI."

---

[5] All further references to the U.S. Code will be to the 2012 edition unless otherwise noted.

Id. GRI 1 requires classification to "be determined according to the terms of the headings and any relative section or chapter notes." GRI 1 (2013). HTSUS chapter and section notes are considered binding statutory law. See BenQ Am. Corp. v. United States, 646 F.3d 1371, 1376 (Fed Cir. 2011). Once the correct heading is identified, the court determines which subheading correctly identifies the merchandise in question. Orlando Food Corp. v. United States, 140 F.3d 1437, 1440 (Fed. Cir. 1998) (citing GRI 1, 6).

    b. **Competing Tariff Provisions**

The government classified the bottle toppers under subheading 3923.50.00, HTSUS at 5.3% ad valorem. The relevant portions of Chapter 39 of the HTSUS read:

| | |
|---|---|
| 3923 | Articles for the conveyance or packing or packing of goods, of plastics; stoppers, lids, caps and other closures, of plastics: |
| 3923.50.00 | Stoppers, lids, caps and other closures. |

Good2Grow contends that the bottle toppers should enter free of charge under subheading 9503.00.00, HTSUS, as:

| | |
|---|---|
| 9503.00.00 | Tricycles, scooters, pedal cars and similar wheeled toys; dolls' carriages; dolls, other toys; reduced-scale ("scale") models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof. |

Although the bottle toppers may be properly classified under 3923.50.00, the court must first assess whether they are properly classified under 9503.00.00, HTSUS because Note 2(y) to Chapter 39 specifically excludes "[a]rticles of chapter 95 (for example, toys, games, sports equipment)." Note 2(y) to ch. 39, HTSUS. Turning to Chapter 95, however, the court is met with another note that the government argues must be considered before the relevant heading.

    c. **Note 1(v) to Chapter 95**

The government argues that Note 1(v)[6] to Chapter 95 precludes classification of the bottle toppers as toys under Heading 9503. Def. Br. at 11–13. Note 1(v) excludes from classification under Chapter 95:

> Tableware, kitchenware, toilet articles, carpets and other textile floor coverings, apparel, bed linen, table linen, toilet linen, kitchen linen and similar articles having a utilitarian function (classified according to their constituent material).

Note 1(v) to ch. 95, HTSUS. Good2Grow avers that Note 1(v) is of limited application meant to exclude "traditional utilitarian items decorated with a <u>holiday</u> motif" from classification under Chapter 95. Pl. Br. at 13. Further, Good2Grow notes that a footnote to Note 1(v) directs one to subheading 9817.95,[7] which allows duty-free entry of certain "utilitarian articles" used in relation to a "religious or cultural ritual" or holiday. Id. at 12 (citing 9817.95, HTSUS). The government responds that Good2Grow's reading is contrary to the text, which is not so limiting, and that the cases Good2Grow cites do not support its interpretation of Note 1(v). See Mem. of Law in Resp. to Pl.'s Cross-Mot. for Summ. J. & in Further Supp. of the Gov't's Mot. for Summ. J., ECF No. 61, at 8–9 (Oct. 7, 2019) ("Def. Reply"). In reply, Good2Grow argues that the government misapplies the <u>ejusdem generis</u> canon and overreads the breadth of Note 1(v). Pl.'s Reply to Def.'s Resp. to Pl.'s Cross-Mot. for Summ. J., ECF No. 65, at 1–2 (Nov. 4, 2019). ("Pl.

---

[6] Now Note 1(w) in the current version of the HTSUS. See Note 1(w) to ch. 95, HTSUS (2020).

[7] The relevant provisions are:

| | |
|---|---|
| 9817.95.01 | Utilitarian articles of a kind used in the home in the performance of specific religious or cultural ritual celebrations for religious or cultural holidays, or religious festive occasions, such as Seder plates, blessing cups, menorahs or kinaras |
| 9817.95.05 | Utilitarian articles in the form of a three-dimensional representation of a symbol or motif clearly associated with a specific holiday in the United States. |

Reply"). Further, Good2Grow contends that Customs' stance during the United States International Trade Commission ("ITC") Investigation No. 1205-6 estops the government from interpreting Note 1(v) to narrow the scope of heading 9503 such that this court's decision in Minnetonka Brands, Inc. v. United States, 110 F. Supp. 2d 1020 (CIT 2000) should be reconsidered. Pl. Reply at 1–4. In supplemental briefing requested by the court, the government maintains that Note 1(v) categorically excludes the bottle toppers from chapter 95 given their inherent utility. See Def.'s Sur-Reply, ECF No. 72, at 6–7 (Feb. 26, 2020) ("Def. Suppl. Br."). Good2Grow continues to argue that Note 1(v) was expressly concerned with festive articles, that it has no applicability here, and that Customs has previously found that Note1(v) does not alter the classification of toys. See Pl.'s Resp. to Def.'s Sur-Reply, ECF No. 73, at 1–5 (Mar. 9, 2020) ("Pl. Suppl. Br.").

The ITC Report referenced by Good2Grow provides some insight as to the proper scope of Note 1(v). See Proposed Modifications to the Harmonized Tariff Schedule of the United States, Inv. No. 1205-06, USITC Pub. 3851 (Apr. 2006) (Final) ("ITC Report"). As the Court of Appeals for the Federal Circuit noted, concerns regarding the breadth of Note 1(v) led the ITC to recommend new, duty-free subheadings–9817.95.01 and 9817.95.05– for certain festive articles in order to "maintain substantial rate neutrality" of those items. See Michael Simon Design, Inc. v. United States, 609 F.3d 1335, 1337 (Fed. Cir. 2010); see also WWRD US, LLC v. United States, 886 F.3d 1228, 1234 (Fed. Cir. 2018) (noting that this new duty-free exception was limited to certain festive utilitarian items used "in the performance of specific religious or cultural ritual celebrations."). Good2Grow appears to understand Note 1(v)'s reference to subheading 9817.95 to mean that Note 1(v) was exclusively concerned with utilitarian items decorated with certain motifs. See Pl. Br. at 13. Not so. Note 1(v)'s language is not so narrow,

and nothing referenced by either party indicates that it was limited to utilitarian items with certain festive motifs.[8] In fact, Heading 9817.95[9] and the reference to it in Note(1)(v) were added to ensure that certain festive articles received duty-free treatment notwithstanding Note (1)(v). See Certain Festive Articles: Recommendations for Modifying the Harmonized Tariff Schedule of the United States, 75 Fed. Reg. 57,293, 57,294 (Int'l Trade Comm'n Sept. 20, 2010); see also Michael Simon Design, 609 F.3d at 1337. Note 1(v) appears to simply reinforce the longstanding understanding that certain merchandise with a primarily utilitarian purpose is not properly classified under Chapter 95. See Childcraft Educ. Corp. v. United States, 742 F.2d 1413, 1415 (Fed. Cir. 1984) ("When amusement and utility become locked in controversy, the question becomes one of determining whether the amusement is incidental to the utilitarian purpose, or the utility purpose incidental to the amusement") (quoting Ideal Toy Corp. v. United States, 78 Cust. Ct. 28, 33 C.D. 4688 (1977)); see also ITC Report at 10 (stating that the "intent of note 1(v) was not to alter the classification of toys, but to reflect the existing scope of chapter 95[.]"); Limitation of the Application of the Decisions of the Court of International Trade and the Court of Appeals for the Federal Circuit in Park B. Smith v. United States, 40-15 Cust. B. &

---

[8] Good2Grow's citation to this court's opinions in Infantino LLC v. United States, Ct. No. 11-497, Slip Op. 14-155, 2014 WL 7331753 (CIT Dec. 24, 2014) and Springs Creative Prods. Grp. v. United States, Ct. No. 10-67, Slip Op. 13-107, 2013 WL 4307857 (CIT Aug. 16, 2013) are unavailing. The court in those cases did not address Note 1(v) and stand for the unremarkable position that merchandise with incidental or some utility still may be properly classified under Chapter 95. See Infantino, Slip Op. 14-155 at 13–15, 2014 WL 7331753, at *8; Springs Creative, Slip Op. 13-107 at 15–18, 2013 WL 4307857, at *8.

[9] Chapter 98 is national in scope and not part of the international harmonized system. See Certain Festive Articles: Recommendations for Modifying the Harmonized Tariff Schedule of the United States, 75 Fed. Reg. 57,293, 57,294 (Int'l Trade Comm'n Sept. 20, 2010).

Dec. 5, 18 (Apr. 5, 2006) ("the new legal note language was viewed as nothing more than a clarification of the existing scope of the heading.").[10]

Turning to normal principles of classification, Note (1)(v) is only applicable if the bottle toppers do "not have a more specific primary purposes that is inconsistent with the listed exemplars." Otter Prods., LLC v. United States, 834 F.3d 1369, 1376 (Fed. Cir. 2016) (citation and quotation omitted). Some ancillary utility does not necessarily render merchandise improperly classified under Chapter 95. Accordingly, whether the bottle toppers are subject to Note 1(v) is decided by assessing whether its principal purpose is utilitarian in nature. To answer this question, the court addresses Good2Grow's contention that the principal purpose of the bottle toppers is not utilitarian and instead is "to provide amusement, diversion, or play." Pl. Br. at 31.

### d. The Merchandise is Not Properly Classified Under Chapter 95

To determine whether subject merchandise is a "toy" under Chapter 95, the court must determine whether its principal use is for "amusement, diversion, or play." See Processed Plastics Co. v. United States 473 F.3d 1164, 1170 (Fed. Cir. 2006)[11] (citing Minnetonka, 110 F.

---

[10] Good2Grow's arguments regarding the interpretive tool ejusdem generis are unavailing. Insofar as that framework is helpful, the bottle toppers are similar to "tableware [or] kitchenware" given that their function, at least in part, is to transmit juice for consumption and seal for later use. Accordingly, the bottle toppers are sufficiently "like [the] named exemplars" in Note (1)(v). See Deckers Corp. v. United States, 532 F.3d 1312, 1314 (Fed. Cir. 2008). As detailed below, the bottle toppers are additionally "articles having a utilitarian function and classified according to their constituent material." Note 1(v) to ch. 95, HTSUS.

[11] The Federal Circuit agreed "with the standard adopted in Minnetonka to determine whether merchandise should be classified as a toy," and considered whether the "primary use" of merchandise at issue in that case rendered the product a toy. Processed Plastics, 473 F.3d at 1170. Accordingly, the court treats Heading 9503 as a use provision. See id.; see also Streetsurfing LLC v. United States, 11 F. Supp. 3d 1287, 1294 (CIT 2014) (noting that "9503.00.00, is a principal use provision.")

Supp. 2d at 1026). ARI 1 "dictates how tariff classification should be construed when the classification decision is controlled by use." Primal Lite, Inc. v. United States, 182 F.3d 1362, 1363 (Fed. Cir. 1999). ARI 1(a)[12] requires the court to determine what group of goods "are commercially fungible with the imported goods." Aromont USA, Inc. v. United States, 671 F.3d 1310, 1313 (Fed. Cir. 2012) (citation omitted). This court may consider the factors outlined in United States v. Carborundum Co., 536 F.2d 373, 377 (CCPA 1976) to determine the principal use of the subject merchandise. Aromont, 671 F.3d at 1312–13; see also Processed Plastics, 473 F.3d at 1170 (noting that the Carborundum factors "are simply areas of inquiry that may prove useful in determining what is the principal use of merchandise alleged to be a 'toy.'"). The Carborundum factors include: use of the merchandise, physical characteristics of the merchandise, economic practicality, expectations of the ultimate purchasers, channels of trade, environment of sale, and recognition in trade. See id., 671 at 1313–16. The court evaluates each in turn.

      i. Use in the same manner as merchandise which defines the class

Good2Grow offered evidence showing that children sometimes use the bottle toppers in various fantasy play and sometimes collect them. See e.g., Pl.'s Exs. 8, 51, 52 (photographs of children playing with the toppers and social media comments about children collecting and playing with the toppers). Further, Good2Grow cites surveys showing that a [[

---

[12] In the absence of special language or context which otherwise requires—

    (a) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use. ARI 1(a).

]]. It avers that the use of the toppers in these ways renders them comparable to toys. Pl. Br. at 26–30. The government argues that notwithstanding evidence that children play with the bottle toppers, they are nearly always bought and used, at least initially, for their functional attributes. Def. Br. 33–36.

Collectability does not a toy make. To be sure, that some customers collect the toppers favors Good2Grow's argument, but that the bottle toppers are collected by some purchasers does not definitively render them anymore a toy than collectible stamps, coins, or spoons. Likewise, that some children engage in imaginative play with the bottle toppers does not necessarily result in their proper classification as toys. See Simon Marketing, Inc. v. United States, 395 F. Supp. 2d at 1280, 1291 (CIT 2005) ("To classify every eye-catching, child-friendly article as a toy, simply because it enhances a child's imagination, is to unacceptably blur the HTSUS headings defeating their purpose and leading to absurd results."). Good2Grow's own research shows that even if children sometimes play with the toppers they are first and foremost bought and used for their functional attributes. See Def.'s Ex. 43 ([[

]]). Some play value is not enough to overcome this primary functional use. The court will not classify merchandise based on "fugitive" use of the product. See Stewart-Warner Corp. v. United States, 748 F.2d 663, 668–69 (Fed. Cir. 1984).

### ii. Physical characteristics of the merchandise

The physical characteristics distinguish the bottle toppers from toys. Although the toppers resemble popular children's characters and thus are certainly more like toys than other juice bottle tops, the additional functionality make them distinct from the prototypical toy.

The parties agree that the toppers meet toy-specific specifications, such as for choke testing, beyond what is required for standard lids or closures, which supports Good2Grow's contention to some extent. Pl. Facts ¶ 53; Def. Resp. Facts ¶ 53; Pl. Br. at 18–20. Good2Grow further points to various production steps that are unnecessary for standard caps or lids. See Pl. Br. at 18–19. But the parties also agree that the merchandise has a threaded cap, straw, and valve that allows the topper to serve as a spill-proof drink dispenser. Pl. Facts. ¶ 5; Def. Resp. Facts ¶ 5; Def. Facts ¶¶ 11, 13–16; Pl. Resp. Facts ¶¶ 11, 13–16. The character heads/busts are not capable of manipulation and are not intended to be removed from the forecap base. Def. Facts ¶ 17; Pl. Resp. Facts ¶ 17. The government points out that in addition to the toy specifications, the forecap is "specifically tested for compliance with FDA standards for beverage use." Def. Br. at 18; see also Def. Facts ¶ 22; Pl. Resp. Facts ¶ 22. Further, the bottle toppers are dishwasher safe and reusable with Good2Grow beverages. Def. Facts ¶ 40; Pl. Resp. Facts ¶ 40. The functional aspects of the bottle toppers are not hidden, but obvious and affixed to the character depiction. Def. Facts ¶ 15; Pl. Resp. Facts ¶ 15. Although the bottles possess certain "toy-like" features, those are ancillary to the inherent functional qualities.

    iii.   **Economic Practicality**

Good2Grow argues that the toppers should be classified as toys because they are far costlier than traditional closures. Pl. Br. at 14–17. It notes that the functional aspects of the forecap cost less than the character depictions which require licensing and royalty fees, among other additional production costs. Id. at 15. Good2Grow spends beyond what is required to ensure that the bottle toppers are spill-proof. Id. Although the juice was once sold separately from the bottle toppers, Good2Grow phased out separate sales in stores as they were lackluster. Id. at 16. Undoubtably, the cost of the juice with character bottle topper, far exceeds the cost of

most retail children's juice. See e.g. Pl. Facts ¶ 39; Def. Resp. Facts ¶ 39. Good2Grow argues that this makes the bottle toppers impracticable as anything other than a toy. Pl. Br. at 14–17.

Good2Grow's evidence supports the opposite contention. It shows that pairing the character topper with a juice bottle increases sales. See Id. at 16–17 (citing Pl.'s Exs. 3, 13, 41). Thus, rather than being economically impracticable, the toppers are used as a lure to sell more juice at a higher price differential. See Kraft Inc. v. United States, 16 C.I.T. 483, 489 (1992) (noting that attractive packaging (in that case bear-shaped jars) "plays a key role in the marketing of food products"). A feature introduced to differentiate a product and increase sales does not necessarily shift a product's classification from one HTSUS heading to another. That each unit costs more is not dispositive when Good2Grow's own records shows that the additional topper appears to increase sales. See e.g. Def.'s Exs. 33 and 34 ([[

]]).

### iv. Expectations of the ultimate purchasers

Good2Grow makes a point to distinguish between the typical purchasers of its bottle toppers (parents) and the typical users of the toppers (children). Pl. Br. at 23–30. Good2Grow cites a report by the Blake Project (a brand consulting firm) finding that consumers viewed the product as both a toy and beverage. Id. The government notes that Good2Grow markets the bottle toppers with juice as a healthy beverage and advertises the product's functionality, for instance that it is dishwasher safe, reusable, and spill proof. Def. Br. at 23–28 (citing Def.'s Exs. 18; 20). The government further quotes Good2Grow's [[                    ]] who on the company's website states that "We put a beverage parents want their children to drink in a package that kids will want to drink from." Def. Br. at 26 (citing Def.'s Ex. 21). Ultimately,

although there is support for both parties' arguments, this factor ultimately supports the government's contention that the toppers are not typically understood to be toys.

### v. Channels of trade in which the merchandise moves

The channels of trade in which the bottle toppers are sold is not particularly helpful to the court's analysis. Although the bottle toppers are distributed to grocery and convenience stores, which weigh against a toy classification, they have also been sold in toy stores. See Def. Facts ¶¶ 30, 43, 46–48; Pl. Resp. Facts ¶¶ 30, 43, 46–48; Pl. Facts ¶ 24–27; Def. Resp. Facts ¶ 24–27. This factor does not benefit either party over the other.

### vi. Environment of the sale

Although the bottle toppers are, at times, sold online without a juice bottle, both parties acknowledge that in stores the bottle toppers are now always sold with the juice bottle attached. Def. Facts ¶¶ 30, 43; Pl. Resp. Facts ¶¶ 30, 43; Pl. Facts ¶ 24; Def. Resp. Facts ¶ 24. Good2Grow appears to argue that because the merchandise is positioned at children's eye-level, this supports the conclusion that the product is a toy. Pl. Br. at 20–23. The government notes that when sold in stores the [[

]] and that the products are typically sold near other beverages. Def. Br. 29–31.

That the bottle toppers are displayed in such a way to encourage children to see and pester their parents to buy them does not make the product a toy, despite that such display may be consistent with how toys are sold. The bottle toppers are no doubt eye-catching and have some amusement value. But uncontroverted evidence demonstrates that the toppers are typically sold with other consumables, most often juice, not in the store locations that display toys. Def. Facts ¶¶ 43–45; Pl. Resp. Facts ¶¶ 43–45; see also Def.'s Ex. 17 (photographs of Good2Grow

displays). Although this factor supports both parties' contentions to some extent, it ultimately favors the government's view that the bottle toppers are not toys.

### vii. Recognition in Trade

Good2Grow argues that, like McDonald's Happy Meal toys, its product is understood to be a toy. Pl. Br. at 30–31. It additionally cites a few of its licensing agreements which describe the toppers as "toyetic." Id. The government notes that Good2Grow portrays itself in advertising and marketing materials as "operating within the children's beverage trade." Def. Br. at 31–33. It further cites beverage trade magazines featuring Good2Grow products. Id. at 32 (citing Def. Ex. 35). Good2Grow's arguments are meritless. The reference to the marketing term "toyetic" in its licensing agreements does not establish that its products are recognized in trade as toys. Good2Grow has not offered significant evidence to support that it is part of the toy industry, rather than the beverage industry. Accordingly, this factor weighs in favor of the government.

### viii. Balance of the Carborundum Factors and this Court's decision in Minnetonka

In sum, the Carborundum factors, taken together, weigh in favor of finding that the bottle toppers are not properly classified as toys. This case is distinguishable from Minnetonka, a case heavily relied on by Good2Grow. See Pl. Br. at 32–35. This difference merits additional discussion. This case was decided prior to the addition of Note 1(v), which clarified that utilitarian goods are not properly classified under Chapter 95. This change to the statutory scheme since Minnetonka, even if it was merely to clarify the existing legal parameters, requires the court to carefully consider whether its holding informs our decision here.

The merchandise at issue in that case—bubble bath bottles shaped like children's characters—arguably had more inherent play value given the resemblance on the bottle to a doll as it was a full-figured representation. See Minnetonka, 110 F. Supp. 2d at 1022. At first glance,

the product in that case appeared to be a toy, and only upon further inspection was it clear that the body of the character contained bubble bath. See id. In contrast, the utility of the bottle toppers is readily apparent, with or without the attached juice bottle. Further, in Minnetonka, the character head of the shampoo bottle was completely cosmetic as there was a screw on cap hidden beneath. Id. Although the topper at issue here is somewhat redundant to the foil seal, it provides additional functionality beyond the amusement added by affixed character head, namely a spill-proof drinking apparatus and closure. Finally, the court in Minnetonka found that merchandise at issue did not compete with other bubble bath and was an "inefficient product for this purpose in terms of both quality and price." Id. at 1027. In contrast, here the evidence demonstrates that the character topper was ultimately employed to increase the profit that Good2Grow made in the children's beverage industry. See infra. At base, although the toppers involve substantial production costs beyond that of standard caps, their inclusion increased the profitability of juice sales and Good2Grow's competition in that marketplace. Whether a product is properly classified as a toy is not a bright-line question, but the court concludes that whether or not the merchandise at issue in Minnetonka would have been correctly classified as a toy under current law, that case's logic and reasoning does not extend to the bottle toppers at issue here.

The court acknowledges that there is certainly some amusement value to the bottle toppers, but concludes that this is incidental to the product's practical purposes such that Note 1(v) is applicable here. Further, viewed in their totality, the relevant factors dictate that the bottle toppers are not commercially fungible with the merchandise in Heading 9503, and thus are not classifiable under that heading.

### e. The Merchandise is Properly Classified Under Chapter 39

The parties disagree about whether Heading 3923 covering "[a]rticles for the conveyance or packing or packing of goods, of plastics; stoppers, lids, caps and other closures, of plastics," is

an eo nomine or a use provision. Good2Grow cites this court's opinion in S.C. Johnson & Son, Inc. v. United States, which found that "Articles for the conveyance or packing or packing of goods, of plastics" rendered Heading 3923, a principal use provision. Pl. Br. at 8 (citing 335 F. Supp. 3d 1294, 1299 (CIT 2018)). The government argues that "stoppers, lids, caps and other closures, of plastics" is an eo nomine provision as it describes articles by specific names. Def. Br. at 10–11.

Good2Grow is correct that the language cited in S.C. Johnson was found to indicate a use provision, but mistakenly attempts to apply the court's analysis to the first portion of Heading 3923 to the court's determination here. As the court has recognized, the use of a semicolon results in "distinct categories of merchandise." B.P. Prods. N. Am. Inc. v. United States, 716 F. Supp. 2d 1291, 1295 (CIT 2010) (citing Commercial Aluminum Cookware Co. v. United States, 938 F. Supp. 875, 883 (CIT 1996)). Accordingly, S.C. Johnson, is not at odds with this court's determination that the latter clause in Heading 3923, "stoppers, lids, caps and other closures, of plastics," is an eo nomine provision as it describes merchandise by name rather than use. Furthermore, since the principle use of this product is to seal or close the juice bottle applying a principal use analysis would not change the result in this case.

"An eo nomine designation, with no terms or limitation, will ordinarily include all forms of the named article." Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citations and quotations omitted). The parties acknowledge that the toppers serve to close the juice bottle and prevent spills. The decorative aspect does not remove the bottle topper from the scope of HTSUS 3923 as this alteration is not "substantially in excess of those within the common meaning of the term." See Casio, Inc. v. United States, 73 F.3d 1095, 1098 (Fed. Cir.

1996) (citation and quotation omitted). The bottle toppers are "stoppers, lids, caps and other closures," the court finds no more apt classification heading.

### f. Subheading

Having determined that the proper classification Heading is 3923, the court addresses which subheading best encompasses the merchandise. "For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheadings notes and, mutatis mutandis, to the [GRIs], on the understanding that only subheadings at the same level are comparable." GRI 6, HTSUS. The bottle toppers are not sensibly classified under any alternative subheadings to the one proffered by the government—3923.50. Compare subheadings 3923.10 ("Boxes, cases, crates and similar articles"); 3923.21 ("Sacks and bags (including cones): of polymers of ethylene"); 3923.29 ("Sacks and bags (including cones): of other plastics); 3923.30 ("Carboys, bottles, flasks and similar articles"); 3923.40 ("Spools, cops, bobbins, and similar supports"); 3923.90, HTSUS ("Other") with subheading 3923.50.00, HTSUS, providing for "[s]toppers, lids, caps and other closures" plainly encompasses the merchandise at issue. Accordingly, the court finds the bottle toppers appropriately classified under 3923.50.00, HTSUS.

## IV.   CONCLUSION

For the foregoing reasons, the court grants the government's motion for summary judgment, denies Plaintiffs' cross-motion for summary judgment, and holds that the government properly classified the bottle toppers under subheading 3923.50.00, HTSUS, at 5.3% ad valorem. Judgment will be entered accordingly.

__/s/Jane A. Restani__<br>Jane A. Restani, Judge

Dated: May 5, 2020
      New York, New York